**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

RAPHAEL STEIN,

                         Petitioner,          22-cv-10683-VB

-against-


ADEENA KOHN,

                                        Assigned to:
                                        Hon. Vincent Briccetti
                                        United States District Judge

                          Respondent.
------------------------------------------------------------------X

## RESPONDENT'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

### A.  FINDINGS OF FACT

    1.    Petitioner, Raphael Stein ("Raphi"), is a citizen of Canada, and the United States. In 2008 – 2012 he attended Fairleigh Dickinson University in New Jersey, wherein he received his B.A. degree in Business Administration and Management.  In 2011 – 2012, he also received his Associate's Degree in Arts and Science at Concordia University in Chicago, Illinois, and then spent two years in Israel as a Technician at the Israel Institute of Technology (2013 – 2015). The Petitioner's employment is unknown right now, but his last known employment was from April 2022 until October 27, 2022 in New York for OKG Tech, based in Pomona, New York.

    2.    Respondent, Adeena Kohn ("Adeena"), is a citizen of the United States and Canada. She was born in Canada, but also holds dual citizenship in the United States.

    3.    The parties met in Canada.  They were first married legally on September 23, 2011, and were later married religiously on December 27, 2011.

4.   They have three children: J.S.S, Z.N.S., and A.Z.S., (the "Children"),  J.S.S. was born in 2016 in Canada, Z.N.S. was born in 2018 in Canada, and A.Z.S. was born in 2020 in Canada. Their current ages are 7, 5 and 3, respectively.

5.   The parties resided in Montreal, Quebec from their marriage in 2011. They then decided to change their place of residency during COVID-19 following the birth of their youngest child, Z.N.S in 2020. The COVID curfew and lockdown also made it difficult to live in quarantine with three young children.

6.   The parties decided to move to Monsey, New York, where they could be closer to the Respondent's family.  They secured an apartment in Monsey, New York, in July 2020, nearby the Respondent's parent residence.

7.   A few weeks before their anticipated departure, Respondent started experiencing severe postpartum symptoms, requiring hospitalization.  She was admitted to the Jewish General Hospital in Montreal and was treated for acute post-partum psychosis.  Shortly after her discharge on August 14, 2020, the parties left Montreal to reside in Monsey, New York.  They arrived in the United States on August 16, 2020, where they resided at 11A Edison Court, Monsey, New York.

8.   Upon her arrival to the United States, the Respondent sought treatment for her post-partum depression and was treated by Dr. Richard Price, from Achieve Behavioral Health, a psychiatrist in Monsey. The Respondent still sees Dr. Price.

9.   Petitioner, the Children and the Respondent have lived in Monsey, New York, continuously from August 2020 to the present day.

10. After the parties and the Children moved to New York, Petitioner initially retained the parties' apartment in Montreal and visited Montreal from time to time, while primarily residing

with the Respondent and the Children in Monsey.  He faced some difficulties crossing the border while COVID-19 quarantine procedures were in place.

11. After the Parties moved to Monsey, Respondent consistently and frequently told Petitioner that she did not wish to return to live in Montreal. Petitioner told her that he disliked  the closeness to Respondent's family in Monsey, and from time to time he proposed securing a home in the United States but away from Monsey.

12. In January 2021, the parties went on a trip to Florida.  They subsequently researched homes for sale and different areas and communities in Florida to relocate.  As stated in his Affirmation dated January 12, 2022, submitted to the Supreme Court, Rockland County in connection with the parties' divorce proceeding, Petitioner secured a pre-approval for a mortgage for a house in Florida and networked with real estate agents.

13. The Court takes judicial notice that as of February 22, 2021, Canada ordered that, when arriving by land, travelers entering Canada at the land border are required to take a COVID-19 molecular test on arrival as well as towards the end of their 14-day quarantine.  The Court takes further judicial notice that this Order allowed for limited exemptions to the requirements for post-entry testing and government-authorized accommodations (as cited above), which includes .persons seeking essential medical treatment outside of Canada.

14. On March 4, 2021, Petitioner asked Respondent to ask Dr. Price to provide her with a note stating that Respondent was receiving treatment in the United States, so that he would not have to quarantine pursuant to the directives of the Canadian Government when visiting Canada to see his family there.

15. Accordingly, on March 17, 2021, Dr. Price signed a note which states: "Patient under my care for medical treatment.  Must remain in New York until completion of treatment," which Respondent gave to Petitioner.

16. On March 25, 2021,  Petitioner gave notice to the landlord of the Montreal apartment that the parties would not renew the lease for the apartment.

17. On May 7, 2021, Petitioner signed an application for the parties and Children to lease  another apartment in Monsey, with a projected occupancy date of August 2021. Petitioner stated in the application that he resided in Monsey and that he worked from home.

18. In May 2021, Petitioner packed up all of the parties' belongings in the Montreal apartment, rented a truck on two occasions, moved all of the parties' furniture and other belongings (except for items given away or discarded) to Monsey, and fully vacated the apartment, as Petitioner confirmed in his affirmation dated January 12, 2022, filed with the Supreme Court of the State of New York, Rockland County. He stated there that, "The packing and moving took 3 months of hard work, and required two separate 20-foot U- Haul truck rentals. I drove both of them down, a few weeks apart."

19. Respondent visited Montreal with the Children from May 14, 2021, to May 23, 2021, during which time she helped Petitioner pack up the belongings in the apartment. When they left, Petitioner drove the U-Haul truck to New York and Respondent drove with the Children by car.

20. Respondent took the Children for two further short visits to Canada, in July 2021 and in August 2021. Subsequently, Petitioner took the Children for short family visits to his parents' house in Montreal in September and October,2022, as expressly authorized by the

4

Rockland County court. Petitioner took no steps to retain the Children in Canada during any of the visits.

21. Promptly after moving to Monsey in August 2020, the parties enrolled the Children in schools and daycare in or near Monsey. The Children have attended such schools and the daycare continuously thereafter. Petitioner attended interviews for such schools and signed and submitted necessary applications. Thus, on May 3, 2021, Petitioner exchanged emails with the local Ohr Reuven School that the parties' oldest child, J.S., was attending concerning his intended registration for the next school year. On June 8, 2021, Petitioner signed a Consent Agreement to attend the school for the 2021-2022 school year commencing September 2021. On October 22, 2021, Petitioner signed, and the parties submitted, an application for their middle child to attend kindergarten locally.

22. On September 6, 2021, the Petitioner affirmed his (continued) consent to the Respondent residing with the children in Monsey via Whatsapp.

23. On September 29, 2021, Petitioner told Respondent that he had filed for divorce and custody in Montreal, Canada. However, he made no such filing.

24. On September 29, 2021, Petitioner sent a text to Respondent and third parties in which he stated that he and the Respondent were separating and that the Children would continue to reside in Monsey with the Respondent. Specifically, he stated as follows:

> "Hey everyone! I know this is going to be pretty shocking but Adeena and I have decided to part ways…. Adeena will be living in Monsey with the kids there most of the time, and I will likely be somewhere else."

25.    On October 4, 2021, Respondent commenced a case in the Supreme Court of New York, Rockland County, for divorce, custody and related relief. The case then

remained entirely dormant until January 12, 2022, when Petitioner moved in the State Court for an order to provide him with interim parenting time with the Children in Monsey, with only limited visits to Canada. He did not demand relocation of the Children to Canada. He did not state that he would file a Hague Convention Abduction case. He did not demand the return of the Children to Canada. He informed the Court that he decided that he preferred to live in Florida, not Canada, and that in January 2021 the parties and the Children had visited Orthodox Jewish communities in Florida with a view to living there instead of Monsey, but that they had not agreed to such a move. He informed the Court that the parties had previously given up their apartment in Montreal and that he had moved all of the family's belongings to Monsey.

26.    Petitioner subsequently made further applications to the State Court and informed the court that he had moved to a separate apartment in Monsey (in November 2021).  He also stated that he had obtained a mortgage pre-approval, for a residence in Florida.

27.    In an Affirmation dated March 8, 2022, filed with the Supreme Court, Rockland County (in connection with the parties' divorce action), he stated that the parties' move to New York had evolved from being temporary to being permanent, and that the Parties "relocated to New York from Canada in August 2020".

28.    In January 2022, Petitioner initiated proceedings against the Respondent before a Jewish court (a "Bais Din") in Monsey, to which the Respondent responded and    asserted her own claims. An initial hearing was held on March 22, 2022. Petitioner then refused to proceed with such proceedings and insisted instead that all issues concerning the custody of the Children should be determined by the State Court under New

6

York law. Thus, by email dated March 28, 2022, he stated that,

> "My understanding was the same as Rabbi Shuchat's, that without an arbitration agreement, there is no point in reconvening to once again discuss what everyone in the New York divorce industry knows; custody matters cannot legally be arbitrated. Although it is already common sense, I have also received guidance from a widely-respected Rov that since Ms. Kohn originally brought it to secular court it should be resolved there."

He then stated by email on March 29, 2022, that,

> "I have agreed to adjudicate all issues in Bais Din, in accordance with New York State law and the circumstances that Ms. Kohn has placed us in. It was me who brought this case to Bais Din in the first place."

      29.    Petitioner never commenced any case in a religious court in Canada and he never asked the religious court in Monsey to order that the Children should be returned to Canada or for any redress arising from any claimed abduction of the Children.

      30.    Petitioner lived with the Respondent and the Children in Monsey until they separated in or about November 2021. Petitioner then leased his own apartment in Monsey, a short drive from Respondent's residence with the Children and has resided there continuously since November 2021. He informed the State Court that "I have a brand new playful bunk bed in the bedroom for the two older children … which is in much better condition and more comfortable for the children than the facilities at Plaintiff's residence. I have a crib for [A.Z.S.] and have a toddler bed available when she is ready. I also have a high-chair for [A.Z.S.]. On the occasions when the children have been to my new residence, they had a great time, and asked to stay longer. My residence is

spacious, well equipped, and I arranged it to be enjoyable for the children."

      31.    The Children lived throughout in Monsey with Respondent and after the Parties' separation they spent substantial time with Petitioner in his Monsey residence.

      32.    On April 25, 2022, each of the parties and their respective attorneys signed the Preliminary Conference Stipulation, which was then so ordered by the Rockland County Court. The order provided that the issues of custody, parenting time and decision-making concerning the Children, together with maintenance, child support and equitable distribution of property were unresolved and remained to be determined by the State Court. The Court separately stated that an attorney for the Children would be appointed and that a forensic psychologist or psychiatrist would be assigned "to do a full-blown evaluation of the children" if the parties could not settle the case.

      33.    In June 2022, Petitioner resigned from his employment with Samasource, a Canadian company, due to the company now requiring in-office hours, and secured employment with OKG Tech, LLC, a company located in Pomona, New York.  Petitioner was employed with OKG Tech from April 2022 until October 27, 2022.

      34.    On August 17, 2022, the State Court entered an Order directing Petitioner to pay child support, spousal maintenance, 70% of unreimbursed medical and child care expenses including day camp, and counsel fees in the amount of $7,500 to the Respondent.  Five (5) days after the entry of this Order, the Petitioner filed an application for the return the Children, under the Hague Convention, with the Canada Government.

      35.    Petitioner failed to comply with the State Court's August 17, 2022 Order and on October 19, 2022, Respondent moved by order to show cause in the State Court to hold Petitioner in willful violation and contempt of the orders.

36.    On November 23, 2022, Petitioner moved to modify the Rockland County financial orders and asserted that he had lost his job in Money, that he was actively searching for new work, and that he had had registered for New York unemployment benefits. He stated further that:

> "36.  Unlike the plaintiff, I do not have immediate family in this area, nor a network of extended family long established in the community. I moved here for the Plaintiff, who told me it was medically necessary for her health. …
>
> I sacrificed immensely in allowing the Plaintiff's needs to dictate all aspects of my life and my children's lives….
>
> I now find myself starting over in a new country,…" [Stein Affirmation, 11/23/22, para. 36]

37.    On information and belief, Petitioner continues to receive New York State unemployment payments.

38.    In an affirmation dated December 5, 2022, in support of an application to receive the benefits of a "poor person" in the State Court case, Petitioner claimed that he had submitted 40 applications for employment in New York without any success.

39.    Petitioner never informed the State Court that he demanded the return of the Children to Canada. Nor did he seek any order permitting him to move the Children back to Canada. To the contrary, he continuously sought the court's assistance in seeing the Children in Monsey only, with occasional short-term visits to Canada, and he submitted all issues concerning the custody of the Children to the State Court.

40.    Respondent has been treated by Dr. Price on a continuing basis since the

parties' move to New York. Petitioner attended several of the sessions. He never informed
Dr. Price that he wanted the Children to return to live in Canada. Dr. Price's notes contain no
such reference. Indeed, Petitioner informed Dr. Price that they were settled in Monsey.

41.     Petitioner obtained health insurance coverage in New York through
Fidelis Care. The Children are fully covered by health insurance in New York.

42.     Petitioner's further continuing conduct, including his settling in
Monsey, obtaining employment in Monsey, obtaining unemployment benefits in New
York, applying for and registering the Children in school in Monsey, and applying to the
State Court for further time with the Children in Monsey, further demonstrates his
continuing and consistent attitude of consent and acquiescence in the Children remaining in
the United States over a significant period of time.

43.     Petitioner filed his Petition with this Court on December 19, 2022.

44.     The Children have lived in Monsey, New York continuously since
August, 2020. Throughout that earlier period they have lived in Respondent's parents'
apartment or in their apartment next door, in the same apartment complex. They live in a
close-knit orthodox community. They have attended the same synagogue in that
community since they first moved to New York, which is the synagogue attended by both
parents' and Respondent's family. They have always attended schools in or near Monsey.
They each have close relationships with numerous friends in the neighborhood, in their
schools, in their synagogue, and in their summer camps. They have participated in
numerous programs in the local community. They have close relationship with their
extended family in Monsey, including grandparents, cousins, and their aunt and her family.
They have developed close relationships with many adult neighbors, teachers, rabbis,

shopkeepers and innumerable other people in their immediate community.

45.     The Children have attended almost all of the Jewish holidays in Monsey during the past three years. In his affirmation dated January 12, 2022, Petitioner correctly asserted that, "Since the time we arrived in Monsey in August 2020, there have been a total of about 50 days of Jewish holidays…. 48 out of those 50 days were spent with the [Respondent's] parents and family."

46.     The Children have continuously received their medical and dental treatment in Monsey since August 2020. Their pediatrician is Dr. Benyamin in Monsey. The parties' youngest child was seen by him on the following dates: 8/27/20, 9/17/20, 10/1/20, 10/5/20, 10/13/20, 11/5/20, 12/21/20, 3/3/21, 3/11/21, 3/25/21, 4/6/21, 4/15/21, 4/19/21, 4/28/21, 5/5/21, 6/2/21, 6/3/21, 7/15/21, 9/2/21, 11/1/21, 11/7/21, 11/8/21, 12/24/21, 1/26/22, 2/3/22, 6/1/22, 8/17/22, 9/8/22, 10/21/22, 12/13/22 and 12/16/22. The other children were likewise treated regularly by Dr. Friedman. The Children have regularly had dental treatment at Kinder Smiles in Spring Valley, New York.

47.     The Children are fully settled in Monsey. Monsey is their home, and has been their only home for more than three years.

## B.  CONCLUSIONS OF LAW

48.     The Second Circuit ruled just a few days ago, in summary form, that "[T]o prevail on a claim under the [ ] Convention a petitioner must show that (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the

removal or retention." … A respondent who opposes a child's return may establish certain

defenses under Article 13 of the Convention. *See Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir.

2013)." *Royal Borough of Kensington and Chelsea v. Bafna-Louis,* Not Reported in Fed.

Rptr., 2023 WL 6173335 (2d Cir. September 22, 2023; Case No. 23-470).

## Relevant Date

49.     The first step in determining a child's habitual residence is to fix the date on

which the alleged wrongful removal or retention took place. The text of the Convention directs

courts to only one point in time in determining habitual residence: the time "immediately before

the removal or retention." Hague Convention, Article 3. In a wrongful removal case, the relevant

date is the date that the child is removed from the country in which the child was living. The

pending case is one of wrongful retention. In such a case, when there is no fixed date of return,

courts have generally held that the wrongful act occurs when the left-behind parent withdraws

his or her consent to the child being retained away from the habitual residence.

50.      In *Taveras v. Morales*, 22 F. Supp. 3d 219, 232 (S.D.N.Y. 2014), *aff'd sub*

*nom. Taveras ex rel. L.A.H. v. Morales*, 604 F. App'x 55 (2d Cir. 2015), the court held that when

a petitioner consents to a child's stay with a respondent until a specific date, the retention

becomes wrongful after that date. If, on the other hand, the petitioner does not specify a return

date at the outset, or initially consents to a stay of indefinite duration, the retention becomes

wrongful on the date the petitioner refuses to agree to an extension of the child's stay or

affirmatively and unambiguously demands the child's return.

51.      In *Karkkainen v. Kovalchuk*, 445 F.3d 280, 286, 290 (3d Cir.2006). the

petitioner allowed her child to travel to the United States and did not set an explicit return date.

Addressing the question of when the retention became wrongful, the Third Circuit explained that

there was "unrebutted evidence in the record showing that, by mid-July 2003, [petitioner] had withdrawn her consent to have [the child] remain in the United States beyond August 10, 2003 and that the Respondents were fully aware of this."  The Court thus concluded that the retention became wrongful on August 10, because the petitioner had "unequivocally communicated" to the respondent that she did not consent to the child remaining in the United States beyond that date.

52.      In *Blackledge v. Blackledge*, 866 F.3d 169 (3d Cir. 2017), the Third Circuit "built on" its decision in *Karkainnen,* holding that the retention date is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof. It explained that that determination is, by necessity, fact-intensive and will vary with the circumstances of each case. In some cases, the notice date and actual expiration date will coincide, but in other cases the notice will indicate a future date as the date consent will be withdrawn, in which case that latter date, depending on the facts of the case, will constitute the expiration date and, hence, the retention date. Applying that formulation, the court in *Blackledge* held that the retention date was not the date that the father stated that he wanted his son returned to him in Germany but was the date when he filed his Hague Convention petition, since only then did he seek to reassert his custody rights and only then did he unequivocally withdraw his consent for son to reside in the United States.

53.      In the pending case, Petitioner repeatedly consented to the Children living indefinitely in New York, as is stated in detail in the following discussion concerning consent. However, it was certain by the end of September 2021 that the parties were at an impasse concerning the Children, and that Respondent was adamant that she was not returning the Children to live in Canada. On September 29, 2021, Petitioner informed Respondent, falsely, that

he had filed a divorce and custody case against her in Canada, and on October 4, 2021, Respondent filed a case in the State Court in New York for divorce and custody. It is possible that the relevant date was far earlier than that when Respondent previously informed Petitioner, as she frequently did, that she would not return to Canada to live with the Children. Thus, at the very latest, the relevant date was October 4, 2021, and it was probably far earlier than that. This date and all other potential dates are more than one year prior to December 19, 2022, when Petitioner commenced the pending action.

54.     Petitioner has argued that the relevant date was the date when Dr. Price determined that Respondent was medically and psychologically fit and able to move back to Canada. However, Dr. Price has still made no such determination and Respondent remains under his care. If Petitioner's argument is correct there cannot possibly be a wrongful retention.

55.     Finally in this regard, another possible date could perhaps be August 28, 2022, which is when Petitioner submitted his application under the Hague Convention to the Canadian Central Authority for the return of the Children. That date is less than one year before the date that the pending case was commenced, so that its selection would prevent Respondent from relying on the affirmative defense of "one year and settled." However, as discussed below, it is submitted that by that time the Children were clearly habitually resident in the United States, and not in Canada, which would then require the dismissal of the Petition.

## Habitual Residence

56.     Petitioner has the burden to prove that the Children were habitually resident in Canada on the relevant date. *Grano v. Martin,* 821 Fed.Appx. 26 (2d Cir. 2020); *Neergaard-Colon v. Neergaard,* 752 F.3d 526, 530 (1st Cir. 2014).

57.     The law in the United States concerning habitual residence was modified by the

U.S. Supreme Court in the landmark case of *Monasky v. Taglieri,* 140 S. Ct. 719, 723, 206

L.Ed.2d 9 (2020).  The Supreme Court stated that, "we hold that a child's habitual residence

depends on the totality of the circumstances specific to the case. An actual agreement between

the parents is not necessary to establish an infant's habitual residence."

58.     In particular, the Court stressed that the place that is the child's home is the

determining factor. Thus, the Court stressed (140 S.Ct. at 726) that,

> "The place where a child is at home, at the time of removal
> or retention, ranks as the child's habitual residence"

and (140 S.Ct at727) that,

> "The aim: to ensure that custody is adjudicated in what is
> presumptively the most appropriate forum—the country
> where the child is at home."

59.     The Court distinguished between cases in which the child is an infant and

therefore too young to acclimate to new surroundings and older children. The Court (Justice

Ginsburg) stated (*id* at 728) that:

> For older children capable of acclimating to their
> surroundings, courts have long recognized, facts indicating
> acclimatization will be highly relevant,"

and in the accompany footnote (footnote 3) stated that,

> "Facts courts have considered include: "a change in
> geography combined with the passage of an appreciable
> period of time," "age of the child," "immigration status of
> child and parent," "academic activities," "social
> engagements," "participation in sports programs and

> excursions," "meaningful connections with the people and places in the child's new country," "language proficiency," and "location of personal belongings."

60.     In a concurring opinion, Justice Thomas stated further that,

> "In 1980, as today, "habitual" referred to something that was "[c]ustomary" or "usual." Black's Law Dictionary 640 (5th ed. 1979); see also 6 Oxford English Dictionary 996 (2d ed. 1989) ("existing as a settled practice or condition; constantly repeated or continued; customary"); Webster's Third New International Dictionary 1017 (1976) (similar). And "residence" referred to a "[p]ersonal presence at some place of abode," Black's Law Dictionary, at 1176, "one's usual dwelling-place," 13 Oxford English Dictionary, at 707, or "the act or fact of abiding or dwelling in a place for some time," Webster's Third New International Dictionary, at 1931; see also *ibid.* ("a temporary or permanent dwelling place, abode, or habitation")."

61.     The new interpretation of habitual residence" in a Hague Convention case was summarized by the Second Circuit in Grano v. Martin, 821 Fed.Appx. 26, 27 (2d Cir 2020)as follows:

> "Under *Monasky*, "a child's habitual residence depends on the totality of the circumstances specific to the case." 140 S. Ct. at 723. "An actual agreement between the parents is not necessary to establish a [child's] habitual residence." *Id.* Some factors for courts to consider in determining "habitual residence" include where a child has lived, the length of time there, acclimatization, and the "purposes and intentions of the parents." *Id.* at 728 (internal

16

> citations omitted). Physical presence in a country is not a dispositive indicator of an infant's habitual residence. *See id.*, 140 S. Ct. at 729."

62.      Likewise, see *Tsuruta v. Tsurata*, 76 F.4th 1107 (8th Cir. 2023), holding that a child's habitual residence is " [t]he place where a child is at home, at the time of removal or retention[.]" *Monasky*, 140 S. Ct. at 726. An actual agreement between the parents is not required to establish habitual residence, instead " a child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 140 S.  Ct. at 72."

63.      Applying these principles to the facts in the pending case makes it clear that the children's home was in Monsey, New York continuously from at least January 1, 2021, by which time they had been living in Monsey continuously for more than four months and were already an intimate and secure part of a very compact and close-knit community. Their bonds with their community then grew substantially throughout the following months and years, further cementing the fact that they became habitually resident in the United States. They have now been habitually resident in the United States throughout at least the past 2 ½ years. The Petition must be dismissed for that reason.

### Consent

64.      The Convention provides that a court need not order the return of a child if the left-behind parent either consented to the child' s removal or retention or acquiesced in the child' s removal or retention.  Article 13(a) states that:

> " [t]he judicial or administrative authority of the requested State is not bound to order the return of the child, if the person, institution or other body which opposes its return establishes that –  (a) the person, institution or other body

> having the care of the person of the child … had consented
>
> to or subsequently acquiesced in the removal or retention."

65.      The consent defense requires a review of Petitioner's subjective intent at the time prior to the child's removal or retention as demonstrated by her statements, actions and other circumstantial evidence. *See In re Kim,* 404 F.Supp.2d 495 at 516 ("The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the intent."). Consent may be established by inference and informally. *Larbie v. Larbie*, 690 F. 3d 295, 308-309 (5th Cir. 2012), as "evinced by the petitioner's statements or conduct, which can be rather informal." In *Larbie*, the Court declared that, crucially, consent for a court in the U.S. to make a temporary custody order suffices to establish consent to the child remaining in the U.S. Consent may be made expressly or may be implied from the Petitioner's conduct. *Walker v. Walker*, 701 F. 3d 1110, 1122 (7th Cir. 2012).

66.      Here, the Petitioner has expressly consented to the Children's remaining in the United States on numerous occasions. Merely by way of example,

    a.   On 10, 2021, he sent an email to a rabbi in Florida stating that,

> "My wife Adeena and I are from Montreal and we have three kids… aged 5, 3 and 1. We are looking for a place to settle down. Montreal is an amazing beautiful city, but unfortunately, the winter is too difficult for my wife."

    b.   On September 29, 2021, he sent a group email stating,

> "Adeena and I have decided to part ways. BH it is amicable … Adeena will be living in Monsey with the kids there most of the time, and I will be likely be somewhere else."

c.  In the Fall, 2021, and on other occasions, he made express representations to schools for the Children to attend in the Monsey area that he, the Respondent and the Children were living permanently in Monsey.

d.  He represented to the State Court that,

"I did everything within my power to keep our family together and to make Plaintiff happy. At Plaintiff's behest, notwithstanding our original plans, we did not return to Montreal."

and he expressly alleged that,

"In January of 2021, the Plaintiff, our three children and I took a family vacation to Florida. We visited communities in Jacksonville, Orlando and Boca Raton and agreed that we would move to one of them for the coming School year. In the ensuing months, I received a mortgage pre-approval, networked with reaI estate agents, started applications for school scholarships, and scouted real estate websites."

67.  The evidence of Petitioner's consent to the Children remaining in New York is confirmed by his consistent course of conduct, including a) his vacatur of the parties' apartment in Montreal, (b) his packing of U-Haul trucks in Canada with substantially all of the parties' belongings and bringing all such belongings to Monsey, (c) his submission of applications for the Children to attend schools, as well as camps and other activities in New York,  (d) his various applications in the State Court case for access to the Children and for mere short visits to Canada to see his parents without ever asking the court for an order that the Children should be returned to Canada, and in submitting all issues as to his rights concerning the Children to the State Court; (e) his failure until December 2022 to ask any court, whether in Canada or in New York, and

whether religious or secular, to retain them in Canada or to return them to Canada; and (f) his actions in obtaining employment in New York, obtaining accommodation in New York  and in otherwise settling fully in New York.

## Acquiescence

68.     The affirmative defense of acquiescence requires the Respondent to establish either (a) a formal statement by the Petitioner or (b) a consistent attitude of acquiescence by him over a significant period of time, all occurring after the date of the alleged wrongful retention. *Laguna v. Avila,* No. 07-CV-5136, 2008 WL 1986253, at *7 (E.D.N.Y. May 7, 2008) (citing *Friedrich v. Friedrich,* 78 F.3d 1060, 1070 (6th Cir. 1996)).

69.     Here, the Petitioner, acting upon the advice of counsel in the State Court case, submitted the issue of the custody of the Children to the New York court. He expressly and formally availed himself of the jurisdiction of the State Court to determine the final custody of the Children. His signature on the Preliminary Conference Stipulation and Order confirms his desire and agreement to allow the State Court to make that determination.

70.     The exception was examined most definitively by the First Circuit in *Nicolson v. Pappalardo*, 605 F.3d 100 (1st Cir. 2010). A left-behind father in Australia, while privately seeking Hague Convention relief through the Australian Central Authority, had consented to the issuance by a state family court in Maine, where the child was located, of an order that protected the child from abuse and that granted temporary custody to the mother. The First Circuit stated that, "it is hard to think of a more formal acquiescence than entering into a *consent order* providing that the other parent be awarded custody," but it ruled that father had sought no more than an initial temporary access order, not a final custody order, such that the proceedings were ambiguous as to whether the father had had a subjective intent to consent to the wife's removal of

the child. Since there was no "clear and unequivocal" expression of an agreement by the father to have final custody determined in a Maine court the acquiescence defense failed.

71.     In sharp contrast, in the pending case the Petitioner availed himself entirely of the custody jurisdiction of the Supreme Court in the divorce and custody case.  His signature on the Preliminary Conference Stipulation and Order confirms his desire and agreement to allow the Supreme Court to make a full and final determination concerning custody.  Thus, acquiescence has been established.

72.     The second and alternative element of acquiescence, that of a consistent attitude of consent by the Petitioner over a significant period of time, is also fully established. He repeatedly consented to the Children staying in New York; he repeatedly took them to Canada for short-term visits and always returned them without protest; he participated fully in the Children remaining in New York and settling in New York for the entire period prior to his commencement of this action; and he took all of the other steps described in the Consent section hereof which, insofar as they occurred after the relevant date, apply to the acquiescence defense.

73.     Thus, in *Bustamente v. Serrano-Figueroa*, 207 F. Supp. 2d 1205 (D. Colo. 2002), mother's acquiescence was established since, by the time she mother filed her petition for child's return to Mexico, the child had been living in the United States primarily with the mother with her consent and full participation in the child's life for six months and with no timeline or stated intent on her part to return to Mexico. Indeed, she moved into an apartment, began volunteering at the child's school, received prenatal care, prepared for the arrival of another child, told no one that the child was being retained against her will, took no steps to secure the child's return, and said nothing about returning to Mexico after the other child was born.

**One Year and Settled**

74.      Article 12 of the Convention provides that, if the proceedings under the Convention are made more than one year after the date of the wrongful removal or retention, the court should order the immediate return of the child unless it is shown that the child "is now settled" in its new environment.

75.      The International Child Abduction Remedies Act provides that "the term 'commencement of proceedings', as used in Article 12 of the Convention means with respect to the return of a child located in the United States, the filing of a petition in accordance with subsection (b) of this section." 22 U.S.C. §9003(f)(3). Subsection (b) of the section provides that proceedings may be initiated "by commencing the civil action for the relief sought in any court which has jurisdiction of such action..." 22 U.S.C. §9003(b). Therefore, the one-year period in the pending case ends on December 19, 2022, when Petitioner filed the pending action. Submitting an application under the Convention to a Central Authority does not commence proceedings within the meaning of Article 12 of the Convention. *See Monzon v. De La Roca*, 910 F.3d 92, 96 (3d Cir. 2018) and *Wojcik v. Wojcik*, 959 F. Supp. 413, 418 (E.D. Mich. 1997) (finding contact with the Central Authority does not commence the proceedings). If the date of the allegedly wrongful retention was October 6, 2021, or a date earlier than that, the Respondent can rely fully on the "one year and settled" defense if the children are now settled in their new environment.

76.      As discussed above, the one-year period commenced no later than October 4, 2021, and probably far earlier than that. This date and all other potential dates are more than one year prior to December 19, 2022, when Petitioner commenced the pending action.

77.     It is fully established that the children are now fully settled in their current environment in Monsey. The Second Circuit has ruled that the use of the term "settled" suggests a "stable and permanent relocation of the child" and "should be viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." *Lozano v. Alvarez*, 697 F.3d 41, 86 A.L.R. Fed. 2d 619 (2d Cir. 2012), *aff'd,* 572 U.S. 1, 134 S. Ct. 1224, 188 L. Ed. 2d 200 (2014).

78.     Similarly, the Eleventh Circuit has held that "we believe that a child is settled within the meaning of ICARA and the Convention when a preponderance of the evidence shows that the child has significant connections to their new home that indicate that the child has developed a stable, permanent, and nontransitory life in their new country to such a degree that return would be to the child's detriment." *Fernandez v. Bailey*, 909 F.3d 353 (11th Cir. 2018).

79.     The evidence that the Children are currently significantly connected to Monsey and are experiencing a stable, permanent and non-transitory life in Monsey is clear, for all of the reasons discussed above. Monsey has been their exclusive home and the place of their entire community and life for more than three full years. It would be cruel to them to now uproot them from that secure and stable environment.

## Conclusions

80.     The date of the allegedly wrongful retention of the Children was October 4, 2021 at the latest. The Petitioner did not commence the proceedings in this case until more than one year after that date. The Children are fully settled in their environment in New York. Therefore, pursuant to the "one year and settled" affirmative defense, the Petition must be dismissed.

81.     If the Court were to hold that the date of the allegedly wrongful retention was within one year of the commencement of the pending case, the Children were habitually resident in the United States at any such time and the Petition must be dismissed for that reason.

82.     The Petitioner by his repeated representations, statements and conduct endorsed the Children remaining in the United States. The Petition must be dismissed by reason of his consent.

83.     Finally, after the Petitioner knew that the Respondent would not return the Children to Canada, he submitted the matter of the custody of the Children to the State Court in New York and he continuously consented by his words and conduct to the Children remaining in the United States. Accordingly, the Petition must be dismissed by virtue of Petitioner's acquiescence.

Dated: New York, New York                    Respectfully submitted,
       September 29, 2023

       /s/ Jeremy D. Morley
       THE LAW OFFICE OF JEREMY D. MORLEY
       By: Jeremy D. Morley, Esq.
       230 Park Avenue,
       Third Floor West,
       New York, New York
       Tel: (212) 808-3065

       KLEYMAN DOMESTIC RELATIONS LAW FIRM, P.C.
       By: Andriana Toscano, Esq.
       1 Rockefeller Plaza, 11th Floor
       New York, New York 10020
       Tel: (212) 401-1977