UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAPHAEL STEIN,<br><br>        Petitioner,<br><br>v.<br><br>ADEENA KOHN,<br><br>        Respondent, | 7:22-CV-10683 (VB) |

**PETITIONER RAPHAEL STEIN'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's order dated August 16, 2023 (ECF No. 28), Petitioner Raphael Stein ("Mr. Stein" or "Petitioner") submits the following proposed findings of fact and conclusions of law.

**I.    PROPOSED FINDINGS OF FACT**

    **A.    Background**

    1.    Montreal, which is situated within the Quebec province of Canada, is the city where Petitioner and Respondent (together, the "Parties") were born, raised, educated, married, had children, and continuously resided after their marriage on September 23, 2011. (Joint Stipulation of Facts ("Jt. Stip.") (ECF No. 44) ¶¶ 2-7; STEIN-000013; STEIN-000350 – STEIN-000353; Petition (ECF No. 1) ¶ 14; Verified Answer (the "Answer") (ECF No. 7) ¶ 3).

    2.    The Parties are the biological parents of three children: J.S. born in 2016, Z.S. born in 2018, and A.S. born in 2020 (collectively, the "Children"). (STEIN-000354 – STEIN-000356).

3. From July 1, 2017 through June 30, 2021, the Parties leased an apartment located at 2502 Ekers Avenue in Montreal, Quebec, Canada. (STEIN-000013; Jt. Stip. ¶¶ 5-6).

4. On March 12, 2020, within one week after the Parties' youngest child was born, the government of Quebec began implementing restrictions to curtail the spread of COVID-19, which had a cascading effect on the availability of healthcare, education, and childcare services. (STEIN-000356; STEIN-000381 – STEIN-000386).

5. Between March 12, 2020 to October 1, 2022, Quebec and the Canadian government implemented a variety of COVID-19 restrictions that included imposing a curfew, travel restrictions, and masking requirements; banning large or private gatherings; and closing schools, places of worship, and stores. (STEIN-000004; STEIN-000304 – STEIN-000306; STEIN-000311 – STEIN-000312; STEIN-000322 – STEIN-000329; Jt. Stip. ¶¶ 12-13).

6. Respondent's immediate family members, including her father and sisters, left Canada to escape the COVID restrictions.

7. Due to COVID-19 restrictions, the Parties could not send their Children to daycare, nor find help with childcare. (STEIN-000642).

8. To alleviate the childcare pressures imposed by the COVID-19 restrictions in Canada, the Parties planned a limited and temporary visit to New York for a "brief period" so Respondent could "have access to more support," "get some respite," and seek her family's help with caring for the Children. (STEIN-000642; STEIN-000668; STEIN-000674).

9. The Parties are dual citizens of the United States and Canada. (Jt. Stip. ¶¶ 1- 2).

10. Petitioner was at all times deeply committed to Respondent, their Children, and what Petitioner perceived as his obligation to maintain peace and unity with Respondent to

ensure Respondent's psychological wellness for the benefit of the Children.  (STEIN-000262; STEIN-000316; STEIN-000437; STEIN-000442 – STEIN-000445; STEIN-000447).

        **B.**        <u>**Respondent's Hospitalization in Canada**</u>

        11.        Respondent began exhibiting signs of exhaustion in early August 2020, and Petitioner took time off from work to give Respondent a break from childcare responsibilities. Petitioner later learned that Respondent began exhibiting increased signs of psychosis, which were unfamiliar to him at the time.

        12.        On August 7, 2020, Respondent's mother, Rivka Kohn ("Mother-in-Law"), brought Respondent to the emergency room at Jewish General Hospital of Montreal.  (STEIN-000642).

        13.        On August 8, 2020, Respondent was hospitalized at Jewish General Hospital of Montreal for treatment of acute psychosis.  (STEIN-000642).

        14.        On August 14, 2020, Respondent was discharged from Jewish General Hospital of Montreal.  (STEIN-000642; Jt. Stip. ¶ 15).

        15.        The Jewish General Hospital of Montreal's medical file notes that the precipitating events for Respondent's psychosis included "[h]ome stressors (new baby, COVID-19, social isolation)" and the Parties' inability to "find outside help in recent months . . . and send their children to daycare" "[d]ue to COVID."  (STEIN-000642; STEIN-000646).

        16.        Respondent's medical file also reflects her intent that she would take a temporary "family trip to New York" for a "brief period" to "visit her family," "have access to more support," and "get some respite" (STEIN-000642; STEIN-000668; STEIN-000674).  Further showing Respondent's understanding that the trip would be temporary in nature, the follow-up notes in the medical file state that (i) Respondent would arrange an appointment with an outpatient psychiatrist "1 month prior to return to Montreal," and (ii) a psychiatrist had been

identified at Achieve Behavioral Health in New York if Respondent needs an in-person appointment while in New York.  (RESPONDENT-000644; RESPONDENT-000668).

        C.       **Intended Temporary Family Visit to New York**

17.      On August 16, 2020, the Parties and their Children (together, the "Family") traveled to New York (Jt. Stip. ¶ 12) to visit family with the shared intent that the Family would return to Canada at the conclusion of Respondent's psychiatric treatment and after the Quebec government had eased COVID-19 curtailment measures that Respondent considered to be harmful. (RESPONDENT-000642; RESPONDENT-000668; RESPONDENT-000674; STEIN-000003).

18.      Upon their arrival in New York, Respondent sent a text message saying, "We just crossed the border[.]  Had no problems[.]  We are going to visit family in Monsey NY." (STEIN-000480).

19.      The Family stayed in Mother-in-Law's apartment in New York (Jt. Stip. ¶ 19; Petition ¶ 32; Verified Answer ¶ 10), and the Children slept on cots situated in the hallway of that apartment.  (STEIN-000471; STEIN-000504).

20.      It is undisputed that prior to August 16, 2020, (i) the Parties and their Children were habitual residents of Canada, (ii) the Parties had rights of custody over the Children, and (iii) the Parties were exercising their rights of custody over their Children (Jt. Stip. ¶¶ 19-20).

21.      On August 31, 2020, Petitioner stated in an email to Respondent his commitment to support her recovery from psychosis and reiterated his understanding that the Children would eventually return to Montreal upon Respondent's recovery.  (STEIN-000262).

22.      Petitioner sent at least three additional emails to Respondent conveying his position that the Children would (i) temporarily stay in the United States to aid in Respondent's recovery from psychosis, and (ii) eventually return to Montreal upon Respondent's recovery.  On

March 5, 2021, Petitioner reiterated to Respondent that he did not consent to the Children permanently living in the United States and wanted the Children to eventually return to Montreal. (STEIN-000263). On April 14, 2021, Petitioner again stated to Respondent that the stay in New York was temporary and he wanted the Children returned to Montreal. (STEIN-000003; STEIN-000264). On July 23, 2021, Petitioner again told Respondent that he wished to return to Montreal. (STEIN-000437).

23. Contemporaneous email evidence shows the Parties communicated to nonparties their intent that the Children would only be in New York for a temporary period. In an email dated September 3, 2020, Rabbi Yosef Rawicki suggested to Respondent that she reapply for one of the Children to attend first grade at Yeshiva Ohr Reuven "should [she] decide on ending up living in Monsey." (STEIN-000430).

D. **Respondent's Psychiatric Treatment by Dr. Richard Price**

24. On August 20, 2020, within a week of her discharge from the Jewish General Hospital of Montreal, Respondent had an intake discussion with psychiatrist Dr. Richard Price at Achieve Behavioral Health in New York. (RESPONDENT_000882).

25. On August 28, 2020, Petitioner accompanied Respondent to an initial appointment with Dr. Price to discuss the prognosis of Respondent's psychiatric condition and to aid in Respondent's recovery. (See Petition ¶ 31; Answer ¶ 3).

26. In an email dated August 31, 2020, Petitioner expressly recapitulated the Parties' understanding that the Children would extend their temporary visit to New York to aid in Respondent's recovery: "I want to do whatever you need for you to recover. If that includes having the kids near you, then that is what we will do, as long as we can. However it should be clear that this is a very temporary measure and we intend to take them back to their schools in

Montreal as soon as we can. I love you and want you to get better really soon." (STEIN-000262).

27. On September 8, 2020, Petitioner asked Dr. Price how long Respondent needed to be in New York before she would be able to return to Montreal. (STEIN-000316).

28. On September 9, 2020, Dr. Price gave Petitioner an approximate timeline for Respondent's recovery: between one to six months. (STEIN-000316; See Petition ¶ 31; Answer ¶ 3). In light of this prognosis, and the COVID restrictions that remained in place in Montreal, Petitioner agreed that the Family would extend their temporary stay in New York so Dr. Price could continue treating Respondent's psychosis. Petitioner consented to the extension on the belief that Respondent was committed to their marriage and keeping the Family intact.

29. When Petitioner expressed his desire to return the Children to Montreal, Respondent insisted that Dr. Price be present for the Parties' discussions about the Family's eventual return to Montreal. Respondent told Petitioner that the subject of returning to Canada caused her distress and discussions about the matter threatened to undo the progress she had made with Dr. Price to heal from psychosis.

30. On at least the following six occasions, Petitioner accompanied Respondent to her appointments with Dr. Price to further discuss the Respondent's prognosis and the Family's eventual return to Montreal: December 16 and 23, 2020; January 13, 2021; February 3, 17, and 24, 2021; and March 17, 2021. (RESPONDENT_000885; RESPONDENT_000888; RESPONDENT_001107; RESPONDENT_001131; RESPONDENT_001134; RESPONDENT_001137; RESPONDENT_001239; Jt. Stip. ¶ 12).

31. For the February 24, 2021 appointment attended by Petitioner, Dr. Price recorded the following in the "History of Present Illness" field showing the Parties' intent to temporarily

remain in New York: "Worked out Purim plan. [Respondent] will make list of her needs to improve her sense of security required for location outside of Monsey where she feels supported by her family." (RESPONDENT_001137 – RESPONDENT_001139). The "Chief complaint" field for the appointment shows "Stable" (RESPONDENT_001138), but Dr. Price did not discuss with Petitioner at the appointment whether he considered Respondent to be "stable."

32. On March 6, 2021, while Petitioner was located in Canada, Respondent sent him a text message acknowledging his desire for them to return home to Montreal and inviting him to "[c]ome here so we can discuss things on how to move forward at our appointments with dr price." (RESPONDENT-000317; RESPONDENT-000381; RESPONDENT_001104).

33. Dr. Price assessed Respondent on March 10, 2021, and recorded in his psychiatric file the word "Stable" in the "Chief complaint" field and noted in the "History of Present Illness" field that "[h]usband coming back next week." (RESPONDENT_001104 – RESPONDENT_001106).

34. After returning to New York, Petitioner accompanied Respondent on March 17, 2021 to her appointment with Dr. Price, who did not discuss with Petitioner whether Respondent was considered to be in "stable" condition. (RESPONDENT_001107). On that same day, Dr. Price issued to Respondent a prescription stating that "patient under my care for medical treatment & must remain in New York until completion of treatment." (STEIN-000317).

35. Petitioner understood from his discussion with Dr. Price on March 17, 2021 that Respondent required ongoing psychosis treatment from Dr. Price. As a result, Petitioner agreed to extend the Family's temporary stay in New York to mitigate the risk that Respondent's psychosis would relapse before her treatment from Dr. Price was complete. Petitioner nonetheless understood that the Family would return to Montreal upon the completion of Dr.

Price's treatment of Respondent's psychosis.  Again, Petitioner consented to the extension on the belief that Respondent was committed to their marriage and keeping the Family intact.

36. Dr. Price's records show that he continued to provide psychiatric treatment to Respondent on a regular basis from November 18, 2020 through no earlier than August 2, 2023. (RESPONDENT_000636 – RESPONDENT_000639; RESPONDENT_000882 – RESPONDENT_001265).

E.  **The Family Continued to Maintain Strong Ties to Canada**

37. Long after the Family arrived in New York on August 16, 2020, Petitioner continued to physically and financially maintain his and the Children's ties to Montreal and show no indication of abandoning the lives they enjoyed in Canada.

38. Since August 16, 2020, while Respondent continued to undergo treatment by Dr. Price, Petitioner and the Children have returned to Canada on nine occasions, at minimum, to visit family and friends and maintain strong ties back home in Montreal.  Petitioner and the Children traveled to Canada on the following dates:  May 14 – 23, 2021; July 30 – August 1, 2021; August 24 – 29, 2021; September 23 – 27, 2022; October 13 –19, 2022; April 10 – 16, 2023; June 22 – 26, 2023; and August 17 – 23, 2023.  (Jt. Stip. ¶ 24; RESPONDENT_000636 – RESPONDENT_000639).  Respondent accompanied Petitioner and Children to Canada on the first three trips.  (Jt. Stip. ¶ 24).  Petitioner and the Children have been in Canada since September 27, 2023 and plan to return to New York on October 4, 2023.  (Jt. Stip. ¶ 32).

39. During the Family's stay in New York, the Parties have been sharing vehicles registered with the motor vehicle authority in Canada and bearing Canadian license plates.  Since April 2020, the Parties have been sharing a minivan that has a Canadian license plate and a current motor vehicle registration in Canada.  (Jt. Stip. ¶ 14; STEIN-000474; STEIN-000503).  In November 2021, Petitioner purchased a sedan in Canada that also bears a Canadian license

plate and a current registration with the motor vehicle authority in Canada.  (Jt. Stip. ¶ 28; STEIN-000475; STEIN-000503).  The parties have been sharing the sedan since April 2022.  (Jt. Stip. ¶ 28).

40. On February 18, 2021, Petitioner filed with Corporations Canada, the Canadian corporation authority, the articles of incorporation and business registration materials for Verisniff Incorporated, a copy Petitioner founded to distribute a device that fights the spread of COVID-19.  (STEIN-000237; STEIN-000320).  Verisniff's corporate documents identify Respondent and her father as members of the company's Board of Directors.  (STEIN-000240).

41. From August 16, 2020 through June 14, 2022, Petitioner continued working remotely as a software developer for Sama, which is located in Quebec.  (STEIN-000012; STEIN-000462).  When Sama mandated that all employees return to work in the office, Petitioner reluctantly resigned from Sama on June 14, 2022 (STEIN-000012), because Respondent was not ready to return to Montreal and Petitioner wished to remain in close proximity to the Children.

42. From August 16, 2020 through December 2021, Petitioner continued to pay for the Children's daycare services at Yeshiva Gedola of Montreal.  (STEIN-000001 – STEIN-000002; STEIN-000460).

43. From August 16, 2020 through June 1, 2021, Petitioner continued to pay rent for the Family's home located at 2502 Ekers Avenue in Montreal, Quebec.  (STEIN-000461).  Mr. Stein reluctantly notified the landlord on March 25, 2021 that he could no longer renew the lease after it ended on June 30, 2021 (STEIN-000431) due to financial constraints.

44. From August 16, 2020 through the present, Petitioner has paid Quebec vehicle registration fees for a minivan and a sedan that the Parties have been sharing in New York.

(STEIN-000448 – STEIN-000449; STEIN-000503).  Both vehicles have a Canadian license plate.  (Jt. Stip. ¶ 28; STEIN-000474 – STEIN-000475).

45.     From August 16, 2020 through the present, Petitioner has filed with the Canada Revenue Agency income statements declaring Quebec as his residential providence.  (STEIN-000339; STEIN-000476).

46.     From July 2, 2020 through June 13, 2022, the Parties filed with the United States Internal Revenue Service income statements reflecting their address in Montreal.  (STEIN-000419; STEIN-000428; STEIN-000411).

47.     In a signed individual income statement to the Canada Revenue Agency dated May 20, 2021, Respondent identified Quebec as her residential providence.  (STEIN-000286 – STEIN-000296).

48.     From April 1, 2020 through April 1, 2022, the government of Montreal deposited into Respondent's personal bank account at least one dozen payments for "Children Assistance," a benefit available exclusively for children who are residents of Montreal.  (RESPONDENT_001266; RESPONDENT_001268; RESPONDENT_001270; RESPONDENT_001274; RESPONDENT_001280; RESPONDENT_001286; RESPONDENT_001292; RESPONDENT_001298; RESPONDENT_001304; RESPONDENT_001327).

    F.     **Breakdown in Marriage & Reconciliation Efforts**

49.     From August 16, 2020 through early January 2022, Respondent consistently led Petitioner to believe that (i) the Parties had an agreement regarding the Children's temporary living arrangement in New York and eventual return to Montreal, and (ii) Respondent was committed to keeping both the Parties' marriage and Family intact.  Petitioner therefore

remained committed throughout this period to preserving the Parties' marriage and taking significant steps to accommodate requests made by Respondent under the guise of reconciliation.

50. Meanwhile, unbeknownst to Petitioner, Respondent and Mother-in-Law had been secretly plotting the Parties' divorce since no later than October 7, 2020, and concealing from Petitioner their true intentions.

    **i.**   **Respondent and Mother-in-Law's Secret Plans for the Parties' Divorce**

51. On October 7, 2020, less than two months after the Family had arrived in New York, Mother-in-Law requested on behalf of Respondent a consultation with divorce attorney James J. Sexton. (Jt. Stip. ¶ 12; SEXTON-000001; STEIN-000469).

52. On October 16, 2020, Mother-in-Law had a legal consultation with James J. Sexton (Jt. Stip. ¶ 12; SEXTON-000002) regarding the dissolution of Respondent's marriage to Petitioner.

53. The Law Offices of James J. Sexton prepared retainer agreements with Respondent for two separate engagements: (a) "drafting of a written Stipulation of Settlement / Separation Agreement and the preparation and filing of an uncontested divorce action"; and (b) "prosecution and/or defense of a divorce action including an attempt to negotiation a resolution of that matter." (SEXTON-000004 – SEXTON-000013; SEXTON-000018 – SEXTON-000027).

54. The Law Offices of James J. Sexton also prepared two invoices. (SEXTON-000003; SEXTON-000017). The first invoice, dated May 30, 2021, was billed to Mother-in-Law and shows receipt of $250 for a consultation on May 31, 2021. (SEXTON-000003). The second invoice, dated September 6, 2021, shows a $15,000 retainer billed to Respondent. (SEXTON-000017).

55. In early October 2021, Respondent and Mother-in-Law consulted with a separate law firm, Montalbano, Codon & Frank, P.C., to prepare a summons and complaint for the dissolution of the Parties' marriage. (STEIN-000409). Respondent commenced on October 4, 2021 a divorce against Petitioner in the Supreme Court, Rockland County (the "Divorce Action"). (Jt. Stip. ¶ 28).

56. Rabbi Chiam Schabes of Congregation Knesseth Israel in New York advised Respondent to pursue the Divorce Action to obstruct Petitioner's efforts to return to Canada and "prevent being dragged to Canada." (RESPONDENT_000880).

57. Prior to filing the Divorce Action, neither Mother-in-Law nor Respondent told Petitioner that they had been consulting with divorce counsel and otherwise planning for Respondent's divorce from Petitioner.

### ii. Respondent's Requests Under the Guise of Reconciliation

58. As the Parties' extended their temporary stay in New York, marital tension increased and was exacerbated by the temporary living situation in Mother-in-Law's apartment, the lack of privacy for the Family, and Petitioner's repeated requests to return to Montreal.

59. To help ease the martial tension, the Family traveled to Florida in January 2021, and the Parties considered relocating to Florida under the guise of reconciliation.

60. Also under the guise of reconciliation, and because the Parties' lease in Montreal was set to expire on June 30, 2021, Respondent convinced Petitioner to relocate the Family's belongings from Montreal to New York throughout May to June 2021.

61. As marital tension increased, Petitioner consulted with an attorney in Montreal. In a September 20, 2021 email to that attorney, and copying Respondent, Petitioner explained that "my wife wants to permanent relocate to New York State with our children, while I would

like to remain in Montreal.  At this point, we decide we will try to stay together, however we would lie to have an agreement in place in case things don't work out." (STEIN-000439).

62.     After initiating the Divorce Action on October 4, 2021, Respondent explained to Petitioner that she filed divorce papers under pressure from Mother-in-Law, who believed the Parties' divorce would be financially beneficial to Respondent.

### G.     Wrongful Retention of the Children

63.     Notwithstanding the pending Divorce Action, Respondent convinced Petitioner that she was interested in reconciling with him.  Respondent asked for, and Petitioner agreed to give her, the "space" she requested.  (STEIN-000246).  Petitioner nonetheless visited the Children at Mother-in-Law's apartment almost daily in October and November 2021.  Respondent explained to Petitioner on October 29, 2021, "I really, really appreciate that you are giving me the space.  It's a big deal to me.  Means so much[.]  Also thank you for the space this morning."  (STEIN-000246).

64.     Believing that Respondent was truly committed to keeping the Parties' marriage and the Family intact, Petitioner agreed to a temporary physical separation from Respondent and in late November 2021 began temporarily renting on a month-to-month basis a two-bedroom apartment located nearby Respondent and the Children.

65.     Respondent also asked that Petitioner seek psychiatric counseling in the interest of reconciliation.  Petitioner acceded to this request by seeing a psychiatrist in Montreal. (STEIN-000446).

66.     At sometime unbeknownst to Petitioner in December 2021, the locks were changed at Mother-in-Law's apartment.  Petitioner was thereafter denied entry into Mother-in-Law's apartment, and Respondent began denying Petitioner regular access to the Children.  By

January 2022, it became clear to Petitioner that Respondent would not allow the Children to return to Montreal.

67. On January 12, 2022, Petitioner filed in the Divorce Action an Order to Show Cause with Temporary Restraints seeking parenting time with the Children. (STEIN-000482 – STEIN-000501).

68. Petitioner filed on August 28, 2022 an application for Return of the Child under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") with the Central Authority in Quebec, and the case was added to a database of the Central Authority on September 23, 2022.

69. On December 19, 2022, Petitioner filed the instant petition under the Hague Convention, as implemented in the United States through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 et seq., seeking return of the Children to Canada.

## II. PROPOSED CONCLUSIONS OF LAW

### A. Goals & Purposes of the Hague Convention

70. The Hague Convention, as implemented through ICARA, was adopted expressly "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble; 51 Fed. Reg. 10494, 10498 (March 26, 1986). The Hague Convention was adopted "in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 130 S.Ct. 1983, 1989 (2010).

71. The Hague Convention seeks to provide a rapid remedy for the left-behind parent to return to the status quo and discourage parents from crossing international borders to engage in forum shopping. *See Monasky v. Taglieri,* 140 S.Ct. 719, 723 (2020) ("the Convention

ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides."); *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) ("The Convention's drafters were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken.") (internal quotation marks omitted); *Gitter v. Gitter*, 396 F.3d 124, 129-30 (2d Cir. 2005) ("The Convention consequently 'places at the head of its objectives the restoration of the *status quo*, by means of the prompt return of children wrongfully removed to or retained in any Contracting State.'")

72. The Hague Convention is premised on the notion that children's interests are best served when they remain in their country of habitual residence while their parents resolve custody disputes in the courts of that country. *See Abbott*, 130 S. Ct. at 1989 ("A return remedy does not alter the preabduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence").

73. To establish a prima facie case of wrongful retention under the Hague Convention, a petitioner must show by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter*, 396 F.3d at 130-31; *see also* 22 U.S.C. § 9003(e)(1) (setting forth petitioner's burden).

74. Once a petitioner has established a prima facie case under the Hague Convention, the child must be returned to the place of habitual residence unless the respondent can establish

one of four narrow affirmative defenses, which include: (1) the well-settled defense, (2) the consent or acquiescence defense, (3) the grave risk defense, or (4) the public policy defense. *Blondin v. Dubois*, 189 F.3d 240, 245-46 (2d Cir. 1999). Only the first affirmative defenses remain in the instant case: (1) that Hague Convention proceeding was not commenced within one year of the child's abduction and the child is well-settled in the new environment, pursuant to Article 12 of the Hague Convention, and (2) that the petitioner had consented to or subsequently acquiesced in the retention, pursuant to Article 13(a) of the Hague Convention. Both affirmative defenses must be established by a preponderance of the evidence. *Id.*

75. Notably, the affirmative defenses are meant to be narrow and "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody." *Blondin*, 189 F.3d at 246.

76. Even if Respondent has satisfied her burden of establishing grounds for one of these narrow exceptions, however, "the court may nevertheless exercise discretion to order repatriation." *Matovski v. Matovski*, No. 06 CIV. 4259 (PKC), 2007 WL 2600862, at *7 (S.D.N.Y. Aug. 31, 2007); *Friedrich v. Friedrich,* 78 F.3d 1060, 1067 (6th Cir. 1996) *(*"a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention.").

### B. The Prima Facie Case of Wrongful Retention

77. There is no dispute in the instate case that, at the time the Family arrived in New York on August 16, 2020, the Children were habitual residents of Canada, and Petitioner had custody rights over the Children under Canadian law and was exercising them.

78. The wrongful retention occurred in or around December 2021, when Petitioner was locked out of Mother-in-Law's apartment, prohibited from entering the apartment, and denied access to the Children.

79. Certainly the wrongful event did not occur when Petitioner conditionally agreed to allow the Children to stay in New York while Respondent was under psychiatric care from Dr. Price. The parties agreed that it was merely a temporary visit in New York and the Family would resume their family life in Montreal once the psychiatric treatment was complete.

80. Losing access to the Children gave Petitioner notice of a material change in the agreement to extend the Children's stay in New York so long as Respondent was committed to the parties' marriage and keeping the Family intact.

81. The question of a "child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 140 S. Ct. at 723. "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id*. at 726. The term "habitual" "suggest[s] a fact-sensitive inquiry, not a categorical one." *Id*. A child's residence in a particular country can only be considered "habitual" when "her residence there is more than transitory." *Id*.

82. Prior to the wrongful retention, the Children had been transitory between New York and Canada. Since the Parties entered the United States on August 16, 2020, the Children traveled to Canada a minimum of eight times to maintain their substantial contacts there. In New York, the Children stayed in temporary living quarters while their home in Montreal remained largely intact until the financial burden of leasing two homes was no longer feasible.

C. **The Affirmative Defenses Apply in this Case**

83. None of the Hague Convention defenses apply in this case.

84. *First*, while Article 12 of the Hague Convention provides as an affirmative defense that the Children has become well-settled in the new surroundings, this defense only applies if the proceedings are commenced more than one year after the wrongful retention. *See* Hague Convention, Art. 12. In the present case, the Petition was filed within a year of wrongful retention.

85. *Second*, Respondent cannot establish by a preponderance of the evidence that Petitioner consented to or subsequently acquiesced in the retention of the Children in the United States. Here, Petitioner did not consent to Respondent's retention of the Children from Canada for an indefinite or permanent time period. Through deception and deliberate secrecy, Respondent managed to prolong the Children's temporary stay in New York.

*  *  *

**D.     CONCLUSION**

86. For the foregoing reasons, the Children wrongfully retained by Respondent in the United States and should therefore be repatriated to Canada.

Dated: September 29, 2023
New York, New York

**Respectfully submitted,**

**COHEN & GRESSER LLP**

/s/ Joanna K. Chan_____

Joanna K. Chan

800 Third Avenue, 21st Floor
New York, New York 10022
Phone:  (212) 957-7600
jchan@cohengresser.com

*Attorney for Petitioner Raphael Stein*